## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **CRIMINAL ACTION NO.** |
| | **1:22-CR-236-SDG-CCB** |
| **JELANI KAZMENDE,** | |
| **Defendant.** | |

## <u>ORDER AND FINAL REPORT AND RECOMMENDATION</u>

Defendant Jelani Kazmende is charged with conspiring to possess a machinegun, to engage in the business of dealing in firearms, and to possess an unregistered firearm, in violation of 18 U.S.C. § 371 (Count One); with engaging in the business of dealing in firearms without a license, in violation of 18 U.S.C. § 922(a)(1)(A) (Count Two); and with possessing a machinegun, in violation of 18 U.S.C. § 922(o) (Counts Three and Five). (Doc. 43).[1] Defendant has filed a number of motions to dismiss the various counts in the indictment, (Docs. 89, 90, 104), the Government filed an omnibus response, (Doc. 116), and Defendant filed a reply, (Doc. 125).[2] Defendant also filed a motion to suppress evidence seized from a

---

[1] The Government dismissed Counts Four and Six. (Docs. 140, 141).

[2] Doc. 89 is a motion to dismiss Counts Four and Six. In light of the fact that

restaurant, (Doc. 91), to which the Government responded, (Doc. 117), and for which Defendant did not file a reply. The motions are now ripe for resolution, and for the reasons stated below, I recommend that all of them be **DENIED** or **DENIED AS MOOT**.[3]

The motions to dismiss present challenges to the various charging statutes that are entirely legal in nature. As such, the Court reserves any discussion of the facts for that portion of the R&R that addresses the motion to suppress.

---

the Government has dismissed those counts, this motion should be **DENIED AS MOOT**.

[3] Defendant filed two motions to adopt motions filed by his co-defendant Robert Jeffords, (Docs. 101, 105), who has since withdrawn his motions and entered a guilty plea, (Docs. 115, 126). At a conference with counsel for Defendant on May 10, 2023, I suggested that the motions to adopt appeared moot because Defendant had subsequently filed his own motions that covered the substance of the motions he was seeking to adopt. Defense counsel asked for some time to ensure that his motions were, in fact, duplicative of the motions he was seeking to adopt. I afforded him that time, told him it was my intention to deny the motions to adopt as moot, and asked him to follow up with the courtroom deputy if he had any concerns after reviewing the motions. Counsel subsequently informed the courtroom deputy that both of the motions he was seeking to adopt were redundant of motions he had already filed. As such, the motions to adopt the co-defendant's motions, (Docs. 101, 105), are **DENIED AS MOOT**.

I.    **Motion to Dismiss All Counts of the Indictment as Unconstitutional Under the Second Amendment**

Defendant argues that the statutes underlying each count in the indictment are unconstitutional under the Second Amendment. (Doc. 90). The Supreme Court recently held that:

> when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2126 (2022). Defendant maintains that the "plain text" of the amendment covers his conduct because the machineguns at issue were "unquestionably arms." (Doc. 90 at 5). He then engages in a historical analysis of each of the three relevant statutes to explain why the laws at issue are inconsistent with the Nation's tradition of firearms regulation. *Id.* at 5–11. The Government, in turn, argues that none of the relevant statutes are covered by the plain text of the Second Amendment. (Doc. 116 at 4–14). It argues that Section 922(o), which regulates machineguns, survives constitutional muster because machineguns are dangerous and unusual weapons

that fall outside the purview of the Second Amendment. *Id.* at 4–11. The Government further maintains that Section 922(a)(1)(A), which prohibits unlicensed individuals from engaging in the business of firearms dealing, does not run afoul of the Second Amendment because that amendment does not cover regulations relating to the manufacture and sale of firearms. *Id.* at 12–14. The Government has the better of the arguments.

### A. Machineguns are Dangerous and Unusual Weapons Outside the Protection of the Second Amendment

Because machineguns are dangerous and unusual weapons that are outside the protection of the Second Amendment, Section 922(o) is not unconstitutional.

The Supreme Court's contemporary Second Amendment jurisprudence began in 2008 with its decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008). There the Court held that a series of D.C. regulations, which effectively banned handguns and which required firearms in the home to be kept nonfunctional even when necessary for self-defense, violated the Second Amendment. The Court engaged in a lengthy discussion of the text and history of the amendment, as well as its own prior cases interpreting the amendment. In discussing and distinguishing its decision in *United States v. Miller*, 307 U.S. 174 (1939), which upheld against a Second Amendment challenge a federal indictment for

4

transporting an unregistered short-barreled shotgun, the Court explained that the right secured by the Second Amendment "is not unlimited" and extends "only to certain types of weapons." *Heller*, 554 U.S. at 623, 626. The Court read *Miller* to say "only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Id.* at 625. In other words, the "sorts of weapons protected were those in common use at the time," which the Court found consistent with "the historical tradition of prohibiting the carrying of dangerous and unusual weapons." *Id.* at 627; *see also id.* at 624 (noting that an alternative reading of *Miller* could result in the "startling" proposition that the National Firearms Act's restrictions on machineguns might be unconstitutional).

Following *Heller*, the Eleventh Circuit applied the dangerous-and-unusual weapon exception to pipe bombs, holding that such instruments "are not typically possessed by law-abiding citizens for lawful purposes" and, as such, are outside the protection of the Second Amendment. *United States v. Tagg*, 572 F.3d 1320, 1326 (11th Cir. 2009). The panel in *Tagg* cited with approval the Eighth Circuit's opinion in *United States v. Fincher*, where that court held, following *Heller*, that "[m]achine guns are not in common use by law-abiding citizens for lawful purposes and

5

therefore fall within the category of dangerous and unusual weapons that the government can prohibit for individual use." 538 F.3d 868, 874 (8th Cir. 2008).

And the Eighth Circuit is far from alone in concluding, post-*Heller*, that machineguns are simply not firearms that find protection within the Second Amendment. *See, e.g., Hollis v. Lynch*, 827 F.3d 436, 443–51 (5th Cir. 2016) (concluding that machineguns do not receive Second Amendment protection because they are dangerous and unusual and, therefore, are not in common use); *United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame*, 822 F.3d 136, 141–44 (3d Cir. 2016) (holding that the Second Amendment does not protect machineguns because they are not in common use for lawful purposes and are "exceedingly dangerous weapons"); *United States v. Henry*, 688 F.3d 637, 639–40 (9th Cir. 2012) (holding that the Second Amendment does not apply to machineguns, which the court characterized as "highly dangerous and unusual weapons that are not typically possessed by law-abiding citizens for lawful purposes" (internal quotation marks omitted)); *Hamblen v. United States*, 591 F.3d 471, 474 (6th Cir. 2009) (holding that the Second Amendment does not protect machineguns); *United States v. Beard*, No. 1:20-CR-351-SCJ-LTW, 2022 WL 18657429, at *7 (N.D. Ga. June 3, 2022) (recommending the denial of a motion to dismiss a § 922(o) count because machineguns are not in common use for lawful

6

purposes), *adopted by* 2023 WL 372914 (N.D. Ga. Jan. 24, 2023). Following *Heller* and *Tagg*, and in light of the persuasive authority noted above, the Court would be hard-pressed to find that machineguns meet the first prong of the *Bruen* inquiry—that is, that possessing them is conduct covered by the plain text of the Second Amendment.[4] The question then is whether anything in the analysis of *Bruen* changes that result. It does not.

In *Bruen*, the Supreme Court held that the Second Amendment protects an individual's right to carry a handgun for self-defense outside the home. 142 S. Ct. at 2122. The Court noted that, following *Heller*, the Courts of Appeals had coalesced around a two-step inquiry for analyzing Second Amendment challenges. *Id.* at 2125. "At the first step, the government may justify its regulation

---

[4] In a pre-*Heller* case, the Eleventh Circuit held that Section 922(o) was not unconstitutional under the Second Amendment. *United States v. Wright*, 117 F.3d 1265, 1271–74 (11th Cir. 1997), *vacated in part on other grounds on rehearing by United States v. Wright*, 133 F.3d 1412 (11th Cir. 1998). The analysis in *Wright* focused on the "well regulated militia" clause of the Second Amendment. *See id.* at 1271 ("Wright claims that he has a constitutional right to possess machineguns and pipe bombs because these weapons are used by contemporary militia fighting forces."). Rather than wade into deciding the extent to which the "well regulated militia" analysis in *Wright* survives *Heller* and *Bruen*, the Court instead focuses on the notion that, after cases like *Heller* and *Tagg*, it is clear that the amendment does not cover dangerous and unusual weapons at all. *See, e.g.*, *Beard*, 2022 WL 18657429, at *7 (noting the defendant's argument that *Heller* abrogated *Wright* and resolving the case on the notion that machineguns are not in common use for lawful purposes).

by establishing that the challenged law regulates activity falling outside the scope of the right as originally understood." *Id.* at 2126 (internal quotation marks and alteration omitted). "If the government can prove that the regulated conduct falls beyond the Amendment's original scope, then the analysis can stop there; the regulated activity is categorically unprotected." *Id.* (internal quotation marks omitted). But if the activity is not categorically unprotected, then the courts analyzed at step two "how close the law comes to the core of the Second Amendment right and the severity of the law's burden on that right." *Id.* (internal quotation marks omitted). The courts then, depending on whether the burden was to a "core" Second Amendment right, applied either strict or intermediate scrutiny. *Id.*

The Supreme Court rejected this two-step analysis. The Court noted that the first step "is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." *Id.* at 2127. But, the Court held, *Heller* does not support the "means-end scrutiny" the courts of appeals were applying at step two. *Id.* As such, the Court adopted the analysis noted above: when the plain text covers an individual's conduct, the Constitution presumptively protects that conduct, and the Government must justify the

8

challenged law by demonstrating that it is consistent with this Nation's historical tradition of regulation. *Id.* at 2126.

In *Bruen*, the Court reiterated that the right secured by the Second Amendment "is not unlimited" and repeated the explanation from *Heller* that the amendment "protects only the carrying of weapons that are those in common use at the time, as opposed to those that are highly unusual in society at large." *Id.* at 2128, 2143 (internal quotation marks omitted); *see also id.* at 2143 (noting that colonial legislatures sometimes prohibited the carrying of "dangerous and unusual weapons"). The analysis in *Bruen* then—at least for purposes of determining the types of weapons that fall within the purview of the Second Amendment—is consistent with what the Supreme Court said in *Heller*. *See also id.* at 2157 (explaining that the holding in *Bruen* decides nothing about "the kinds of weapons that people may possess" and that the Court did not disturb anything it said in *Heller* "about restrictions that may be imposed on the possession or carrying of guns") (Alito, J., concurring); 2162 (noting that the Second Amendment allows for a "variety of gun regulations" and quoting the passage from *Heller* recognizing "the historical tradition of prohibiting the carrying of dangerous and unusual weapons" (internal quotation marks omitted)) (Kavanaugh, J., with whom the Chief Justice joins, concurring).

9

It is no surprise, then, that courts have continued to hold, post-*Bruen*, that the Second Amendment protections simply do not extend to machineguns. *See United States v. Dixon*, No. 22 CR 140, 2023 WL 2664076, at *3 (N.D. Ill. Mar. 28, 2023) ("Thus, *Miller*, *Heller*, and *Bruen* foreclose any challenge to the federal machinegun ban. The Second Amendment simply does not extend to 'dangerous and unusual weapons.'"); *United States v. Simien*, ___F. Supp. 3d___, 2023 WL 1980487, at *8–9 (W.D. Tex. Feb. 10, 2023) (finding that machineguns are within the category of "dangerous and unusual" weapons that do not receive Second Amendment protection); *United States v. Holton*, ___F. Supp. 3d___, 2022 WL 16701935, at *3 (N.D. Tex. Nov. 3, 2022) (holding that § 5861(d) does not regulate protected conduct under the Second Amendment); *United States v. Hoover*, No. 3:21-CR-22(S3)-MMH-MCR, 2022 WL 10524008, at *13 (M.D. Fla. Oct. 18, 2022) (finding nothing in *Bruen* that "would undermine" the line of authority holding that the Second Amendment does not protect machineguns).

Defendant's argument that the plain text covers machineguns because they are "arms," (Doc. 90 at 5), simply ignores all of the authority cited above addressing the Supreme Court's statement in *Heller* that the right secured by the Second Amendment is not unlimited and that it extends "only to certain types of weapons"—and not those that are "dangerous and unusual." 554 U.S. at 623, 626–

10

27.[5] He maintains that machineguns are no more dangerous than any other type of modern firearm. (Doc. 90 at 9). This argument is, to say the least, unpersuasive. Here the Court fully agrees with the Ninth Circuit's sentiments from *Henry*: "A modern machine gun can fire more than 1,000 rounds per minute, allowing a shooter to kill dozens of people within a matter of seconds. *See George C. Wilson, Visible Violence,* 12 Nat'l J. 886, 887 (2003). Short of bombs, missiles, and biochemical agents, we can conceive of few weapons that are more dangerous than machine guns." 688 F.3d at 640.

Defendant suggests that machineguns are not unusual, pointing to ATF statistics that he maintains establish the fact that of the 7,512,175 guns in the United States, 10.14% are machineguns. (Doc. 90 at 10; Doc. 125 at 3–5). The Government maintains that his figures are simply wrong. (Doc. 116 at 8–11). Either way, other judges on this Court have rejected a similar argument in the past, noting that the

---

[5] Defendant suggests that whether a specific type of firearm is protected by the Second Amendment must be determined at the second step of the *Bruen* analysis, and not the first. (Doc. 125 at 2–3). This argument does not seem entirely consistent with how Defendant framed the issue in his opening brief, where he suggested that, under the first step, machineguns were covered because they are "arms." (Doc. 90 at 5). Nevertheless, regardless of where the issue is considered, the caselaw noted above is consistent in holding that machineguns are simply outside the protection of the Second Amendment, and nothing in *Bruen* suggests anything to the contrary.

statistics Defendant relies upon include guns possessed by law enforcement, as well as weapons owned before § 922(o) took effect. *Beard,* 2022 WL 18657429, at *7. The Fifth Circuit in *Hollis* considered a number of statistics about machineguns and found that "[n]one of them allow a conclusion that a machinegun is a usual weapon." 827 F.3d at 449; *see also Simien*, 2023 WL 1980487, at *9 (noting that civilian-owned machineguns account for less than .2% of the total firearms in the United States and concluding that they therefore remain too insignificant to be considered in common use).[6]

Finally, Defendant argues that the guns he possessed could not inspire more fear or terror among the people than any other firearm because, according to him, there is nothing about them that indicates that they are automatic. (Doc. 90 at 11). The only way to learn that, he says, would be to see them in action—and he never used them. *Id.* But "*Heller* plainly states that mere possession of certain weapons may be prohibited." *One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame*, 822 F.3d at 143 (holding that "the most logical reading is that

---

[6] Defendant suggests it would be unfair to deny him the right to possess a machinegun given that § 922(o) grandfathered in those that were possessed prior to when the statute was enacted. (Doc. 90 at 10). Maybe so. But that says nothing about whether machineguns are dangerous and unusual.

'dangerous and unusual' describes certain categories of weapons, and not the manner in which the weapons are used").[7] As such, the fact that Defendant did not use the machinegun is simply not relevant to whether that weapon is protected by the Second Amendment.

---

[7] Defendant writes off *Heller*'s reference to the "historical tradition of prohibiting the carrying of dangerous and unusual weapons" as "dicta." (Doc. 125 at 2). *Heller* is, to be sure, a case about handgun regulations, and not about machineguns. And the analysis in the various opinions the Justices issued in *Heller* is lengthy and dense at times, covering some 150 pages in the United States Reports. But the discussion in the majority's opinion about dangerous and unusual weapons was necessary to distinguish *Miller*, upon which Justice Stevens placed "overwhelming reliance" in his dissent. *Heller*, 554 U.S. at 621. And the Eleventh Circuit in *Tagg* relied on that portion of *Heller* for its holding. 572 F.3d at 1326 ("Applying *Heller* to the facts of this case, we conclude that the pipe bombs at issue were not protected by the Second Amendment. Unlike the handguns in *Heller*, pipe bombs are not typically possessed by law-abiding citizens for lawful purposes."). Other circuits have followed suit. *See, e.g., Hamblen*, 591 F.3d at 474 ("Hamblen's challenge to his conviction for unlawful possession of unregistered machine guns has been directly foreclosed by the Supreme Court, which specifically instructed in *Heller* that 'the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes.'"). But even if some of the discussion in *Heller* about those weapons that are outside the protection of the Second Amendment is dicta (and I do not think that it is), it is Supreme Court dicta. And that is not something "to be lightly cast aside." *Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006) (internal quotation marks omitted).

**B. Commercial Firearm Dealing Is Not Covered By the Second Amendment**

Because the Second Amendment does not cover the commercial selling of firearms, Section 922(a)(1)(A) is not unconstitutional.

Count Two charges Defendant with willfully engaging in the business of dealing in firearms without being licensed to do so, in violation of 18 U.S.C. § 922(a)(1)(A). (Doc. 43). Defendant gives the argument for why this statute violates the Second Amendment relatively short shrift in his initial motion, suggesting only that "virtually no regulations existed" at the time of the framing of the Constitution regarding who could buy or sell firearms, absent some that were racially motivated. (Doc. 90 at 6–7). The Government maintains that Defendant's argument fails at the first step of the *Bruen* analysis because the Second Amendment simply does not cover the *commercial* dealing in firearms. (Doc. 116 at 12–14). I agree with the Government.

The Supreme Court made clear in *Heller* that individual self-defense was the "*central component*" of the Second Amendment. 554 U.S. at 599 (emphasis in original). And it doubled-down on that sentiment in *Bruen*. 142 S. Ct. at 2133 ("As we stated in *Heller* . . . individual self-defense is the central component of the Second Amendment right." (internal quotation marks and emphasis omitted)).

14

Indeed, the *Heller* majority made clear (albeit probably in dicta) that:

> nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, *or laws imposing conditions and qualifications on the commercial sale of firearms*. [FN 26 – We identify these *presumptively lawful regulatory measures* only as examples; our list does not purport to be exhaustive.]

554 U.S. at 626–27 & n.26 (emphasis added). And Justice Alito, in his *Bruen* concurrence, noted that nothing in that opinion decided anything about "the requirements that must be met to buy a gun." 142 S. Ct. at 2157 (Alito, J., concurring). A notion further emphasized by Justice Kavanaugh and the Chief Justice, who quoted the passage noted above in full in their *Bruen* concurrence while stating that the Second Amendment "allows a variety of gun regulations." *Id.* at 2162 (Kavanaugh, J., and the Chief Justice, concurring) (internal quotation marks omitted).

The Court agrees with the Government that the Second Amendment, which protects "the right of the people to keep and bear Arms," simply does not extend to the commercial sale of firearms. U.S. Const. amend. II. As noted above, *Heller* made clear both that the central component of the amendment is individual self-defense (suggesting, as the text makes plain, a right concerned with possession) and that nothing in its opinion should be taken to cast doubt on longstanding laws

imposing conditions and qualifications on the commercial *sale* of arms (which the Court described as "presumptively lawful"). *Heller*, 554 U.S. at 599, 626–27 & n.26. It is of little surprise, then, that courts post-*Heller* (and post-*Bruen*, for that matter) have rejected the argument that the Second Amendment protects the right to commercially sell a firearm. *See, e.g., United States v. Hosford*, 843 F.3d 161, 166 (4th Cir. 2016) (citing to *Heller* and concluding "the prohibition against unlicensed firearm dealing is a longstanding condition or qualification on the commercial sale of arms and is thus facially constitutional"); *United States v. Flores*, ___F. Supp. 3d.___, 2023 WL 361868, at *2–6 (S.D. Tex. Jan. 23, 2023) (rejecting a challenge to § 922(a)(1)(A) and finding that the Second Amendment does not protect the right to commercially deal in firearms); *United States v. King*, ___F. Supp. 3d.___, 2022 WL 17668454, at *3 (E.D. Pa. Dec. 14, 2022) (finding § 922(a)(1)(A) constitutional because "the Second Amendment does not protect the *commercial* dealing of firearms"); *United States v. Tilotta*, No. 3:19-CR-4768-GPC, 2022 WL 3924282, at *5 (S.D. Cal. Aug. 30, 2022) (concluding that the plain text of the Second Amendment does not cover the commercial sale and transfer of firearms); *see also United States v. Focia*, 869 F.3d 1269, 1286 (11th Cir. 2017) (noting, in the course of addressing the constitutionality of § 922(a)(5), that § 922(a)(1)(A) "qualifies as the kind of presumptively lawful regulatory measure described in *Heller*" (internal alteration

16

omitted)); *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 681–90 (9th Cir. 2017) (*en banc*) (holding that the Second Amendment "does not independently protect a proprietor's right to sell firearms").

It is helpful to clarify the limited nature of what the Court is required to decide. Section 922(a)(1)(A) makes it illegal for any person who is not a licensed importer, manufacturer, or dealer "to engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce." The indictment alleges that Defendant was an unlicensed dealer who engaged in the business of dealing in firearms. (Doc. 43 at 3). And "engaged in the business" is a defined term:

> as applied to a dealer in firearms, as defined in section 921(a)(11)(A), a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms.

18 U.S.C. § 921(a)(21)(C) (2019) (the statute was amended on June 25, 2022, after Defendant's course of conduct). And the term "with the principal objective of livelihood and profit" means "that the intent underlying the sale or disposition of

17

firearms is predominantly one of obtaining livelihood and pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection." 18 U.S.C. § 921(a)(22) (2019). Thus, the Court need only decide whether the Second Amendment encompasses a person's right to deal in firearms as a regular course of trade or business to make a profit. The statute at issue does not impact Defendant's ability to keep or bear arms, nor his ability to buy firearms for other than commercial purposes, nor even his ability to commercially sell firearms *with* a license. *See King*, 2022 WL 17668454, at *3. With those limitations in mind, and consistent with *Heller* and the other authority noted above, the Court finds that the Second Amendment does not encompass the right to sell firearms commercially with the principal objective to make a profit.

Defendant cites to a trio of district court cases finding that the plain text of the Second Amendment covers receipt of a firearm, for purposes of 18 U.S.C. § 922(n) — which makes it illegal for, among other things, a person under indictment for a felony to receive any firearm. (Doc. 125 at 7–8); *United States v. Stambaugh*, ___F. Supp. 3d___, 2022 WL 16936043, at *3 (W.D. Okla. Nov. 14, 2022); *United States v. Holden*, ___F. Supp. 3d___, 2022 WL 17103509, at *3 (N.D. Ind. Oct. 31, 2022); *United States v. Quiroz*, ___F. Supp. 3d___, 2022 WL 4352482, at *4 (W.D. Tex. Sept. 19, 2022). But receiving a firearm and selling one in the regular course of

18

trade or business to make a profit are two very different things. Nor does it follow, as Defendant suggests, that if receiving a firearm is protected, transferring one must necessarily be protected as well. (Doc. 125 at 8). Again, the conduct here is not one person simply handing a firearm to another. It is selling one in the regular course of trade or business to make a profit. And Defendant's argument—that the Second Amendment "implies by logical necessity a right to commercially deal in firearms"—is unsupported and contrary to what the Supreme Court stated in *Heller* and *Bruen*, as well as the other authority noted above. *See Flores*, 2023 WL 361868, at *4 (rejecting a similar argument).

For all the reasons stated above, Defendant's motion to dismiss each count in the indictment as unconstitutional under the Second Amendment, (Doc. 90), should be denied.

## II.   Motion to Dismiss Counts One, Three, and Five as Unconstitutional Under the Commerce Clause

Defendant argues that § 922(o), which prohibits the possession of a machinegun, is unconstitutional under the Commerce Clause. (Doc. 104). This argument is foreclosed by binding Eleventh Circuit precedent.

Defendant acknowledges that the Eleventh Circuit has previously considered and rejected an argument that Congress exceeded its authority under

19

the Commerce Clause when it enacted § 922(o). *United States v. Wright*, 117 F.3d 1265, 1268–71 (11th Cir. 1997), *vacated in part on other grounds on rehearing by United States v. Wright*, 133 F.3d 1412 (11th Cir. 1998). As such, the first question is whether the Court is bound by *Wright*. Under the prior panel precedent rule, this Court is bound to follow a prior Eleventh Circuit panel's holding "unless and until it is overruled or undermined to the point of abrogation by an opinion of the Supreme Court or [the Eleventh Circuit] sitting en banc." *United States v. Gillis*, 938 F.3d 1181, 1198 (11th Cir. 2019). "To overrule or abrogate a prior panel's decision, the subsequent Supreme Court or en banc decision must be clearly on point and must actually abrogate or directly conflict with, as opposed to merely weaken, the holding of the prior panel." *Id.* (internal quotation marks omitted). And, of course, it matters not whether the Court believes the panel's decision to be correct, or whether there were better arguments that could have been considered by the prior panel—the Eleventh Circuit has "categorically reject[ed] any exception to the prior panel precedent rule based upon a perceived defect in the prior panel's reasoning or analysis as it relates to the law in existence at that time." *Smith v. GTE Corp.*, 236 F.3d 1292, 1303 (11th Cir. 2001).

*Wright* was decided in 1997, and it analyzed and applied the Supreme Court's decision in *United States v. Lopez*, 514 U.S. 549 (1995). Defendant maintains

20

that two Supreme Court cases that came after *Lopez*, *United States v. Morrison*, 529 U.S. 598 (2000) and *Gonzales v. Raich*, 545 U.S. 1 (2005), compel a different result than the one the circuit reached in *Wright*. (Doc. 104 at 5). And, he maintains, subsequent to *Wright*, the Eleventh Circuit has articulated a "new test" in *United States v. Peters*, 403 F.3d 1263 (11th Cir. 2005), for determining whether a statute is authorized by the Commerce Clause. (Doc. 104 at 5).

First *Peters*. To start, *Peters* is a panel opinion. So it could not have overruled or abrogated *Wright*. Nevertheless, some explanation of *Peters* is helpful to show why Defendant's argument fails. *Peters* considered whether 18 U.S.C. § 922(d)(1) — which makes it a crime to sell a firearm to another person, knowing or having reason to know that person is under indictment for, or has been convicted of, a felony — violates the Commerce Clause. 403 F.3d at 1270. The court quoted the text of the Commerce Clause and identified the three broad categories of activity that Congress may regulate under its commerce power. *Id.* at 1271 (quoting *Lopez*, 514 U.S. at 558). "First, Congress is empowered to 'regulate the use of the channels of interstate commerce'; second, Congress properly may 'regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities'; and finally, Congress is authorized 'to regulate those activities having a substantial

21

relation to interstate commerce, *i.e.*, those activities that substantially affect commerce.'" *Id.* (quoting *Lopez*, 514 U.S. at 558–59). The court focused on the third category—activities that substantially affect commerce—and identified "four basic considerations that guide this inquiry." *Id.* at 1271–72. "These are (1) whether the regulated activity is commercial or economic in nature; (2) whether the statute contains an express jurisdictional requirement, capable of limiting its reach to a discrete set of cases; (3) whether the statute or its legislative history contains congressional findings articulating the effect of the regulated activity on interstate commerce; and (4) whether the activity's effect on commerce is direct, as opposed to attenuated." *Id.* at 1272. For these factors, the court cited *Morrison*. *Id.* But it noted that the "first case to employ these factors was *United States v. Lopez*." *Id.* And it then proceeded to explain how the *Lopez* Court considered each of the four factors as they applied to that case. *Id.*

The way *Peters* articulated and explained the four factors makes clear that they were not in any way "new," at least vis-à-vis *Lopez*. Rather, they came from the *Lopez* decision, which *Wright* analyzed and considered in the course of upholding § 922(o). To the extent Defendant maintains that the *Wright* panel should have, but did not, consider each and every one of the factors, as articulated by *Peters*, that argument amounts to nothing more than a suggestion for how

*Wright* could have done a better job resolving the issue. Regardless, *Peters* gives this Court no basis for revisiting the analysis undertaken by *Wright*.

That leaves *Morrison* and *Raich*, and whether either of those cases undermine *Wright* to the point of abrogation. One need go no further than the first paragraph in *Morrison* to recognize that it does not. There, the Supreme Court considered the civil remedy section of the Violence Against Women Act of 1994 and the Fourth Circuit's opinion finding that provision unconstitutional. 529 U.S. at 601–02. The Court wrote: "Believing that these cases are controlled by our decisions in [*Lopez*], *United States v. Harris*, 106 U.S. 629 (1883), and the *In re Civil Rights Cases*, 109 U.S. 3 (1883), we affirm." *Id.* at 602. Thus, right off the bat, the Court in *Morrison* explained that the result in that case was "controlled" by *Lopez* and two others. Hardly the language of undermining to the point of abrogation.

The subsequent analysis in *Morrison* shows that the Court tracked the *Lopez* decision in explaining why Congress exceeded its authority under the Commerce Clause in enacting the challenged provision. 529 U.S. at 607–19. Far from overruling or undermining *Lopez*, *Morrison* used *Lopez* as the analytical framework for explaining its decision. Nothing in *Morrison*, therefore, undermines *Lopez* to the point of abrogation and, as such, *Morrison* does not afford this Court the authority to disregard *Wright*.

23

Which brings us to *Raich*. There the plaintiff argued that Congress exceeded its authority under the Controlled Substances Act by categorically prohibiting the possession and manufacture of marijuana as applied to the intrastate possession and manufacture of marijuana for medical purposes pursuant to California law. 545 U.S. at 15. The Court noted that none of its Commerce Clause cases could be read in isolation, and it relied heavily on *Wickard v. Filburn*, 317 U.S. 111 (1942), which it described as being "of particular relevance." *Id.* at 15–17. It also analyzed *Lopez*, however, and explained that *Lopez* "casts no doubt" on the validity of the statute at issue in *Raich*. *Id.* at 25. Nor, the Court held, did *Morrison*. *Id.* And it engaged in a lengthy discussion analyzing why its resolution in *Raich*—that the challenged statute was constitutional—was not inconsistent with either *Lopez* or *Morrison*. *Id.* at 25–33. Although *Raich* was not nearly the straightforward application of *Lopez* that the Court articulated in *Morrison*, neither did *Raich* overrule or undermine *Lopez*. It simply distinguished it and explained why the holdings in all three cases—*Lopez*, *Morrison*, and *Raich*—were consistent.

Simply put, nothing in *Raich* overrules or undermines *Lopez* to the point of abrogation. And, as such, that opinion does not abrogate *Wright* (which applied *Lopez*). Defendant goes through the *Peters* factors and explains why, in his view, they suggest a different outcome than the one the Eleventh Circuit reached in

*Wright.* (Doc. 104 at 6–10; Doc. 125 at 9–21). But that is not an exercise in which this Court may engage. Indeed, Defendant's suggestion that the outcome here "ignores recent decisions that implicate the true historical and logical underpinnings of the Commerce Clause" and "ignores the interpretation of the Commerce Clause [as changing] as the Nation develops," (Doc. 125 at 9), reflects a misunderstanding of what this Court may do when faced with an Eleventh Circuit opinion that has directly resolved the question at issue. To do away with *Wright*, there must be an *en banc* or Supreme Court opinion "clearly on point" and which "actually abrogate[s] or directly conflict[s] with, as opposed to merely weaken[s]," that prior case. *Gillis*, 938 F.3d at 1198 (internal quotation marks omitted). As demonstrated above, there is not. As such, this Court is not free to write on "a clean slate," as Defendant suggests. (Doc. 125 at 13). Quite to the contrary, this Court is bound to follow *Wright*. Therefore, there would be no utility in engaging in the analysis Defendant suggests—it is sufficient to simply note that the motion to dismiss, (Doc. 104), is due to be denied in light of *Wright.*[8]

---

[8] Defendant asks that, if the Court declines to find § 922(o) unconstitutional, that it certify the question to the Eleventh Circuit. (Doc. 125 at 21). The Court is not aware of any authority that would allow it to do so. If the District Judge adopts this recommendation and denies the motion, Defendant will have the ability to appeal that decision in due course. But the Court is not aware of a procedure to "certify a question" to the circuit.

### III. Motion to Suppress

Defendant moves to suppress evidence seized from a restaurant that he owned. (Doc. 91). He argues that there was no probable cause to believe that the restaurant would contain evidence related to automatic firearms. *Id.* at 4. The Government maintains that there was probable cause and, even if probable cause was lacking, the good-faith exception applies. (Doc. 117). The Court agrees with the Government.

The Government obtained a federal search warrant for Defendant's restaurant, Right Off the Bone Turkey Legs ATL (the restaurant), on June 16, 2022. (Doc. 117-1). The affidavit offered in support of the warrant states that in May of 2022, a confidential human source (CHS) informed the FBI that a man named Wiley Martin was selling machineguns. *Id.* at ¶ 5. Martin told the CHS that he obtained the firearms from a military veteran who lived out of state. *Id.* Martin agreed to meet the CHS on June 2, 2022, to sell him six automatic weapons for $6,000. *Id.* at ¶ 7.

On June 2, agents observed Martin meet Defendant at the restaurant. *Id.* at ¶ 8.[9] Defendant got out of a Ford Excursion with North Carolina plates and

---

[9] The affidavit does not identify Defendant as the man that Martin met with. However, Defendant concedes for purposes of this motion that he is the person

transferred several long brown boxes into Martin's vehicle. *Id.* Martin then departed the parking lot. *Id.* Agents later learned that Defendant owned the restaurant. *Id.*

The CHS and two undercover FBI employees (UCEs) met Martin near a neighborhood store. *Id.* at ¶ 9. Martin showed the UCEs five firearms in boxes. *Id.* Martin told them the guns were fully automatic. *Id.* He said that the sixth firearm was at his house, and he could retrieve it. *Id.* The UCEs paid Martin $5,000 for the firearms, and Martin told them he could sell them more firearms in the future. *Id.*

Agents observed Martin drive to a residence, where he retrieved a box that he placed in his vehicle. *Id.* at ¶ 10. Martin then drove back to the neighborhood store, showed the UCEs the sixth firearm in the box, and sold it to them for $1,000. *Id.* The UCEs and other agents observed what appeared to be "full-auto sears," which convert a weapon to allow it to shoot fully automatic, inside some of the firearms they purchased from Martin. *Id.* at ¶ 11.

On June 16, 2022, an FBI UCE scheduled a second meeting with Martin to buy ten more automatic rifles. *Id.* at ¶ 13. Martin contacted the CHS at approximately 1:30 p.m. that day to let the CHS know that Martin's source of

---

referenced in the affidavit. (Doc. 91 at 2 n.1).

supply was stuck in traffic and would be bringing 16 guns. *Id.* At approximately 2:09 p.m., agents observed Martin meet with Defendant in the parking lot of the restaurant. *Id.* at ¶ 14. At 3:30 p.m., a GMC Yukon with North Carolina plates arrived at the restaurant. *Id.* at ¶ 15. An unidentified male exited the Yukon and gave three large brown boxes to Defendant. *Id.* Defendant placed the boxes on a bench behind the restaurant, and Defendant and Martin then carried the boxes into the restaurant. *Id.* A United States Magistrate Judge signed a search warrant for the restaurant on June 16, 2022, at 6:35 p.m. (Doc. 117-1 at 10).

Defendant argues that there was nothing more than "speculation" to support the notion that the three boxes agents observed on June 16, 2022, contained automatic firearms. (Doc. 91 at 4). A magistrate judge reviewing a search warrant is "simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and the basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Jiminez*, 224 F.3d 1243, 1248 (11th Cir. 2000) (internal quotation marks omitted). "Because probable cause deals with probabilities and depends on the totality of the circumstances, it is a fluid concept that is not readily, or even usefully, reduced to a neat set of legal rules." *Gill ex rel. K.C.R. v. Judd*, 941

28

F.3d 504, 516 (11th Cir. 2019) (internal quotation marks omitted). "It requires more than mere suspicion, but does not require convincing proof." *Id.* at 516–17 (internal quotation marks omitted). As the Eleventh Circuit has explained, the "mere probability or substantial chance of criminal activity is all that is needed . . . [and n]othing even approaching conclusive proof or proof beyond a reasonable doubt is required." *United States v. Delgado*, 981 F.3d 889, 897 (11th Cir. 2020) (internal quotation marks omitted). "All in all, it's not a high bar." *Gill*, 941 F.3d at 517 (internal quotation marks omitted).

And in reviewing the federal search warrant that was issued in this case, the undersigned need only determine that the magistrate judge had a *substantial basis* for concluding that probable cause existed. *United States v. Joseph*, 709 F.3d 1082, 1093 (11th Cir. 2013); *United States v. Maxson*, No. 1:18-CR-404, 2020 WL 703137, at *2 (N.D. Ga. Feb. 12, 2020) ("The duty of a reviewing court is simply to ensure that the magistrate judge had a substantial basis for concluding that probable cause existed." (internal quotation marks and alteration omitted)).

There is ample probable cause to support the search warrant. Agents observed Defendant meet with Martin at the parking lot of the restaurant prior to the firearms sale on June 2. Defendant transferred several long brown boxes into Martin's vehicle, and Martin then sold automatic firearms—which were still in

boxes—to the UCEs. Martin told the UCEs he could get more firearms in the future. Agents knew that another sale was planned for June 16. At 1:30 on the 16th, Martin told the CHS that his source of supply was stuck in traffic; at 2:09 Martin arrived at the restaurant and met with Defendant; and at 3:30 a Yukon arrived at the restaurant. The fact that the Yukon with North Carolina plates arrived at 3:30 is consistent with the notion that the driver of that vehicle was the source of supply, who was stuck in traffic as of 1:30.

The driver of the Yukon then gave Defendant three large brown boxes. Defendant and Martin brought those boxes into the restaurant, and agents sought a search warrant. The events of June 16 are sufficiently similar to those of June 2— when agents know Martin sold automatic rifles to the UCEs—to provide probable cause to believe that the large brown boxes of June 16 contained automatic rifles.

Defendant maintains that on June 16, the FBI did not know the name of the driver of the Yukon, the FBI did not know what was inside the boxes, the FBI had never seen the inside of the restaurant, and the boxes from June 2 did not have Defendant's name on them. (Doc. 91 at 4). But the FBI did not have to *know* any of that information. Rather, there only had to be a mere probability or substantial chance of criminal activity. *Delgado*, 981 F.3d at 897. And here there was in light of the events of June 2.

30

The Government argues that even if the warrant was not supported by probable cause, the good-faith exception applies. (Doc. 117 at 7–8). Defendant did not address good faith in his motion, nor did he file a reply brief. In *United States v. Leon*, the Supreme Court held that the exclusionary rule should not bar the use of evidence "obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause." 468 U.S. 897, 900, 922 (1984). The good-faith exception should *not* apply in these circumstances:

> (1) where the magistrate judge was misled by information in a warrant application that the applicant knew was false or would have known was false but for a reckless disregard of the truth; (2) where the magistrate "wholly abandoned" her judicial role; (3) where the affidavit supporting the warrant application was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or (4) where the warrant was "so facially deficient" that officers couldn't have reasonably presumed it to be valid.

*United States v. Taylor*, 935 F.3d 1279, 1291 (11th Cir. 2019) (quoting *Leon*, 468 U.S. at 923). "The good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *United States v. Taxacher*, 902 F.2d 867, 871 (11th Cir. 1990). Under the "so lacking in indicia" inquiry, the focus is on whether the officer or agent acted in objective good faith, and not on

whether the information was sufficient to create debate or disagreement among reasonable jurists. *Taxacher*, 902 F.2d at 871–72. Here the FBI agent consulted with an Assistant United States Attorney and then submitted the matter to a neutral United States Magistrate Judge, which are "steps . . . indicative of objective good faith." *Id.* at 872. And the probable cause (which, as noted above, I think is more than sufficient) is not so weak as to render official belief in its existence entirely unreasonable. Nor is there any suggestion that the information in the affidavit was false. Defendant's motion to suppress evidence seized from the restaurant, (Doc. 91), based on the alleged illegality of the search warrant, should be **DENIED**.

## IV.   Conclusion

For the reasons stated above:

- The motions to adopt the co-defendant's motions, (Docs. 101, 105), are **DENIED AS MOOT**;

- I **RECOMMEND** that the motion to dismiss Counts Four and Six, (Doc. 89), be **DENIED AS MOOT**;

- I **RECOMMEND** that the motions to dismiss based on the Second Amendment and the Commerce Clause, (Docs. 90, 104), be **DENIED**; and

- I **RECOMMEND** that the motion to suppress, (Doc. 91), be **DENIED**.

**IT IS SO ORDERED and RECOMMENDED,** this 17th day of May, 2023.

_____
CHRISTOPHER C. BLY
UNITED STATES MAGISTRATE JUDGE